# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

LIBERTARIAN PARTY OF ERIE COUNTY,
MICHAEL KUZMA,
RICHARD COOPER,
GINNY ROBER,
PHILIP M. MAYOR,
MICHAEL REBMANN,
EDWARD L. GARRETT, and
DAVID MONGIELO,

    *Plaintiffs,*

                   **COMPLAINT**

  v.

ANDREW M. CUOMO, as Governor of the State of
New York,
ERIC T. SCHNEIDERMAN, as Attorney General
of the State of New York; and,
JOSEPH A. D'AMICO, as Superintendent of the New York State
Police.

    *Defendants.*

---

"The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a *strong moral check against the usurpation and arbitrary power of rulers*; and will generally, even if these are successful in the first instance, *enable the people to resist and triumph over them.*"

    --Joseph Story, COMMENTARIES ON THE
    CONSTITUTION OF THE UNITED STATES (1833)
    (emphasis added)

**DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Plaintiffs hereby demand a jury trial of all issues so triable.

1

# INTRODUCTION

1. This is an action to vindicate the right of the plaintiffs to keep and bear arms under the Second Amendment to the United States Constitution, which prohibits infringement of the right of law-abiding citizens to keep commonly-possessed firearms for the defense of self and family and for other lawful purposes.

# PARTIES

2. The Plaintiff, LIBERTARIAN PARTY OF ERIE COUNTY, is an unincorporated association operating in Erie County whose platform includes support for the right to bear arms.

3. The LIBERTARIAN PARTY OF ERIE COUNTY brings this action on behalf of itself and its members.

4. The plaintiff MICHAEL KUZMA is a resident of the City of Buffalo and Erie County.

5. The plaintiff RICHARD COOPER is a resident of the Town of Westbury and County of Nassau.

6. The plaintiff GINNY ROBER is a resident of the Town of Vestal and Broome County.

7. The plaintiff PHILIP M. MAYOR is a resident of the Village of East Aurora and Erie County.

8. The plaintiff MICHAEL REBMANN is a resident of the Town of Amherst and Erie County.

9. The plaintiff EDWARD L. GARRETT is a resident of the Town of Evans and Erie County.

10. The plaintiff DAVID MONGIELO is a resident of the Town of Lockport and Niagara County.

11. Defendant ANDREW M. CUOMO is the Governor of the State of New York whose principal place of business is in Albany (Albany County), New York.

12. Defendant ERIC T. SCHNEIDERMAN is the Attorney General of the State of New York whose principal place of business is in Albany (Albany County), New York.

13. Defendant JOSEPH A. D'AMICO is Superintendent of the New York State Police whose principal place of business is in Albany (Albany County), New York.

14. All Defendants herein are being sued in their official capacities.

## JURISDICTION

15. Jurisdiction is founded on 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(a)(3) as this action seeks to redress the deprivation, under of color of the laws, statutes, ordinances, regulations, customs and usages of the State of New York, of rights, privileges or immunities secured by the United States Constitution.

16. This action seeks relief pursuant to 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 1983.

17. Venue lies in this district pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS RELATED TO ALL CAUSES OF ACTION

18. The plaintiffs would like to exercise their natural right to keep and bears arms, a right the existence of which is acknowledged by and protected by the Second Amendment to the United States Constitution, applicable to the States pursuant to the Fourteenth Amendment to the United States Constitution. *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. Chicago*, 561 U.S. 742 (2010).

19. This right is threatened by New York State laws and their enforcement by the defendants as specified below.

20. The plaintiffs would like to exercise such right for all the reasons underlying the Second Amendment, including but not limited to self-defense and the defense of their families against criminals and defense and deterrence against the prospect of tyrannical government.

21. Examples of tyrannical governments in history include the Soviet Union, Nazi Germany and Pol Pot's Cambodia.

22. The signposts of incipient tyrannical government in America would include one or more of the following:

    a. Mass confiscation of firearms;

    b. Mass arrests without probable cause;

    c. A crackdown on free speech, press or assembly;

    d. Martial law (other than during an actual invasion by a foreign army);

    e. Prohibition of homeschooling or private schools;

    f. House-to-house searches or permanent roadblocks, checkpoints or mandatory internal passports.

23. While the United States government has not engaged in these practices or the kinds of atrocities associated with the States cited above, it is reasonable to be concerned about the future.

24. A recent study found the federal government guilty of systematic torture of detainees in the years after 9/11.

25. Historian R. J Rummel, an expert on democide (murder by government), estimates that in the 20th Century, American government killed over 500,000 people, mostly non-combatants killed during bombing raids in foreign wars.

26. The relative rarity of democide against American citizens is consistent with the notion that a well-armed populace deters democide.

27. In Federalist No. 46, James Madison argued that there is no reason to be concerned about the federal government becoming tyrannical in part because of "the advantage of being armed, which the Americans possess over the people of almost every other nation. . ."

28. Madison, in effect, argued that the armed populace would defeat the Federal Government's "standing army" in battle!

29. If the drive to deprive Americans of their right to bear arms continues, Americans could soon be as vulnerable to democide as any other people.

### The Purpose of the Right to Bear Arms

30. The appearance of the signposts of tyrannical government would trigger the right of the people to alter or abolish their government using the tools provided by the right to bear arms, that right being the guarantor of the right of revolution recognized in the Declaration of Independence.

31. The right of revolution, stated by Jefferson and Lincoln and put into practice by Washington, is itself simply the manifestation of the fact that the *people, not the government*, have ultimate and unalienable sovereign power.

32. Thus, the currently fashionable and shallow approach of treating the right to bear arms as merely a nuisance standing in the way of the battle against street crime, is rooted in willful historical ignorance.

33. The Supreme Court has held that the right to bear arms is a "fundamental right." *McDonald v. Chicago*, 561 U.S. 742, 778 (2010).

5

34. The right to bear arms is entitled to at least the same amount of respect, protection and enforcement that is provided to the other fundamental rights such as free speech, petition, assembly and due process.

35. If there is to be any disparate treatment of the right to bear arms due to its unique nature, it should be given even greater respect, protection and enforcement than the other rights because, logically, historically and empirically, *it is the most important right enumerated in the Bill of Rights; it is the right that protects and guarantees all the others.*

36. Unlike the rights to free speech, religion, assembly and petition, being deprived of the right to bear arms can result in immediate death at the hands of a criminal or a tyrannical government (see, e.g., Kent State, Wounded Knee), such death rendering the entire remainder of the Bill of Rights moot and meaningless at that point.

37. Each year in the United States, there are numerous reports of police misconduct and many fatalities associated with those complaints.[1]

38. At the same time when New York State is aggressively attacking the people's right to bear arms, law enforcement is rapidly escalating its own firepower.

39. According to a study by the Cato Institute, "Over the last 25 years, America has seen a disturbing militarization of its civilian law enforcement, along with a dramatic and unsettling rise in the use of paramilitary police units (most commonly called Special Weapons and Tactics, or SWAT) for routine police work. The most common use of SWAT teams today is to serve narcotics warrants, usually with forced, unannounced entry into the home. These increasingly frequent raids, 40,000 per year by one estimate, are needlessly subjecting nonviolent drug offenders, bystanders, and wrongly targeted

---

[1] L. Dane, "500 Innocent Americans Killed by Cops Each Year," *LewRockwell.com* (Dec. 16, 2013).

civilians to the terror of having their homes invaded while they're sleeping, usually by teams of heavily armed paramilitary units dressed not as police officers but as soldiers. These raids bring unnecessary violence and provocation to nonviolent drug offenders, many of whom were guilty of only misdemeanors. The raids terrorize innocents when police mistakenly target the wrong residence. And they have resulted in dozens of needless deaths and injuries, not only of drug offenders, but also of police officers, children, bystanders, and innocent suspects." ("Overkill: The Rise of Paramilitary Police Raids in America," by Radley Balko, July 17, 2006.)

40. Furthermore, historically, it was the right to bear arms, exercised by the Colonists at Lexington and Concord to defeat the British gun control expedition that ultimately allowed the Colonists to form their own government and enshrine the other rights into the Bill of Rights after the war was won.

**New York Gun Laws**

41. Presently, in the State of New York, the plaintiffs cannot lawfully purchase, possess, carry, keep or bear a "firearm" in their home as that term is defined in the New York without the permission of local officials. N.Y. PEN. LAW § 265.00(3).

42. Plaintiffs can only keep and bear a pistol or revolver or handgun in their home with the prior permission of the state—a license--after meeting, in the subjective opinion of a state licensing officer, a number of different criteria the imposition of which violates the Second Amendment.

43. The United States Court of Appeals described the latitude provided state judges in denying licenses as being "vested with considerable discretion." *Kachalsky v. County of Westchester*, 701 F.3d 81, 87 (2d Cir. 2012).

7

44. Such unlicensed possession would constitute a crime under the Penal Law and subject the plaintiffs to the risk of prosecution and imprisonment merely for exercising their natural and constitutional right to bear arms in their own homes for noble purposes.

45. Thus, New York State explicitly treats the right to bear arms as a "privilege," not a right, and *boasts of this unconstitutional policy* in numerous court decisions. E.g., *Guddemi v. Rozzi,* 210 AD2d 479 (2nd Dept. 1994); *Shapiro v. New York City Police Dept.,* 201 AD2d 333 (1st Dept. 1994).

46. For example, applicants must prove they have "good moral character."

47. The state may not condition the exercise of a fundamental right on prior proof of "good moral character."

48. The term "good moral character" is undefined in the statute and is not susceptible of any precise definition or any rational definition whatsoever.

49. In our society, there is no general agreement of what "good moral character" means.

50. Some behavior that years ago would have been considered proof of the lack of good moral character is no longer considered to be such.

51. The statute also conditions the issuing of a permit on the absence of "good cause . . . for the denial of the license," yet, provides no definition of "good cause," thus placing the recognition of constitutional rights in the hands of bureaucrats and their arbitrary and subjective judgments. Penal Law 400(1)(g).

52. The imposition of such conditions that are impossible to define violates both the Second Amendment right to bear arms and the due process clauses of the Fifth and Fourteenth Amendments.

53. In most counties in the state, it can take a year or more to obtain a permit.

54. If the permit is denied, judicial intervention can take an additional year and a half including one appeal as of right to the Appellate Division and cost as much as $5000 for legal fees and costs.

55. The permit process involves a massive invasion of privacy, forcing the applicant to identify his or her closest friends who are then subjected to a criminal record check themselves.

56. The permit process can be expensive, thus preventing many low-income persons from applying for a permit.

57. The permit process can also be time-consuming, constituting a burden not imposed for the exercise of numerous other fundamental constitutional rights.

58. In the case of an application for a carrier permit, the applicant must prove "proper cause" in order to exercise a fundamental right.

59. While this requirement has been ruled constitutional by the United States Court of Appeal's for the Second Circuit, it is complained of here so as to preserve the issue for reconsideration by the Second Circuit or review by the Supreme Court. See, *Kachalsky v. County of Westchester*, 701 F.3d 81. (2d Cir. 2012); but see *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014).

60. A right that can only be exercised by seeking prior permission of the government, which permission can be withheld at the government's subjective discretion, is a right that has ceased to exist.

61. The plaintiffs seek injunctive and declaratory relief to remedy the defendants' violation of their right to bear firearms in their homes and elsewhere.

62. The plaintiff PHILIP M. MAYOR has obtained a pistol permit but remains under constant threat of having his license revoked based on application of the arbitrary and subjective criteria set forth in the statute.

63. Further, he is unlawfully restricted in the firearms he can purchase and carry and he is forced by the risk of immediate arrest to carry his permit on him at all times.

64. While the primary purpose of the right to bear arms is to deter government tyranny and allow the people to resume their sovereignty against a tyrannical government, personal and familial self-defense is an important secondary purpose.

65. Several of the plaintiffs travel in or reside in or nearby high crime areas where murder, rape, robbery, and house burglaries are common.

66. Police response time in areas where the plaintiffs reside is no better than five minutes for high priority calls.

67. A burglar can break into a home within seconds.

68. Thus, even if plaintiffs were able to locate a phone in the dark after being roused from sleep by a thug breaking a window, it is extremely unlikely that they could summon police assistance before a confrontation with a dangerous criminal in their own homes.

69. The plaintiffs must have access to firearms in their homes to protect themselves and their families from violent crime.

70. Guns are a useful self-defense tool and are used tens of thousands of times each year in the United States to ward off criminals.

71. Mere gun possession does not cause crime. The proof of that proposition can been seen in the suburban and rural areas surrounding high-crime Buffalo.

72. While the rates of gun ownership in these towns are very high, rates of violent crime are much lower than in urban areas with lower rates of gun ownership.

73. High crime rates in urban areas are caused, not by the availability of guns, but by numerous failed public policies such as the war on drugs, welfare (leading to fatherless families), and government schools leaving students ill-prepared for working in the lawful economy, and economic policies which make urban areas hostile places for entry-level jobs.

74. Thus, gun control laws serve the important political function of offering up a scapegoat for the failure of various government policies that engender crime.

75. The courts should not allow politicians to destroy fundamental rights by using them as scapegoats for their own failures.

76. As Governor of the State of New York, defendant ANDREW M. CUOMO "shall take care that the laws are faithfully executed." N.Y. Const., Art. IV, §3. As such, the Governor is responsible for the administration and enforcement of the Penal Law, which he conducts through various officers, agents, and employees.

77. As Attorney General for the State of New York, defendant ERIC T. SCHNEIDERMAN shall "prosecute and defend all actions and proceedings in which the state is interested . . . ." Executive Law § 63(1).

78. As Superintendent of the New York State Police, defendant JOSEPH A. D'AMICO is required to enforce the criminal and administrative provisions of the Penal Law throughout the State. "It shall be the duty of the superintendent of the state police and of members of the state police to prevent and detect crime and apprehend criminals." Executive Law § 223.

79. Because of the administration and enforcement of the above provisions of the pistol permit law by the defendants, the plaintiffs have been, and will continue to be, subjected to irreparable harm.

80. At all times herein, the defendants were acting under color of state law.

81. All of the statutes, regulations, court actions, customs and practices referenced herein constitute state action within the meaning of the Constitution.

82. At all times herein, the actions of the defendants have been intentional or in reckless disregard of the clearly established rights of the plaintiffs.

## FIRST CAUSE OF ACTION
## SECOND AMENDMENT

83. The New York pistol permit law (Penal Law Sections 400.00 and 265.00), on its face and as it is applied by state and local officials, violates the Second Amendment and Fourteenth Amendment rights of the plaintiffs to possess firearms in their homes for the following reasons:

    a. A state may not license or impose a prior restraint on a fundamental right. See, e.g., the 1st, 3rd, 4th, 5th, 6th, 7th, 8th and 14th Amendments; *Murdock v. Pennsylvania*, 319 U.S. 105 (1943).

    b. The requirements of proving "good moral character," integrity and the absence of "good cause" to deny a license violate the Second Amendment. See, *Schneider v. New Jersey*, 308 U.S. 147 (1939).

    c. The apparently unrestrained grant of authority to licensing officials to revoke licenses "at any time" violates the plaintiffs' right to bear arms.

d.  The costs of obtaining a permit are unduly burdensome for poor persons and persons of modest means.

e.  The amount of time permit applicants are required to wait for approval is unduly burdensome, particularly for people who are elderly, terminally ill and who have an urgent need for firearms for self-defense because they live in a high crime area or have been threatened.

f.  In the case of the terminally ill or the elderly, the waiting period could exceed their actual lifespan or a large portion of their lifespan.

g.  The statute's requirement that an applicant prove he has not been convicted of a "serious offense" is unconstitutionally overbroad.

h.  The mandatory disclosure of close friends for references, together with the imposition on them of a criminal background check and the imposition upon the applicant of the burden of confessing to one's close friends all of one's sins and shortcomings that a licensing official might conceivably deem significant (see, *Novick v. Hillery,* 183 AD2d 1007 (3rd Dept. 1992)), violates the privacy of all concerned, is unduly burdensome and invites retaliation against political activists and their closest friends.

i.  The mandate to provide references in the county where the application is processed violates the rights of those who recently moved into an area.

j.  Applicants bear the burden of proof of their entitlement to the "right" to bear arms; receive no hearing before their entitlement to this right is initially determined, and receive post-deprivation judicial review that presumes the licensing officer's decision is correct and applies a deferential standard of review and imposes the burden of proving error upon the alleged "right"-holder.

Case 1:15-cv-00634-FPG Document 81 Filed 07/20/15 Page 14 of 18

## SECOND CAUSE OF ACTION

## SECOND AMENDMENT

84. The New York pistol permit law (Penal Law Section 400.00 and 265.00), on its face, violates the Second Amendment and Fourteenth Amendment rights of the plaintiffs to carry firearms in public for the following reasons:

   a. The requirement of an applicant for a carrier permit to show "proper cause," a determination ultimately based on the virtually unfettered discretion of licensing officials and review judges, violates the Second Amendment.

   b. A state may not license or impose a prior restraint on a fundamental right. See, e.g., the 1st, 3rd, 4th, 5th, 6th, 7th, 8th and 14th Amendments; *Murdock v. Pennsylvania*, 319 U.S. 105 (1943).

   c. The requirements of proving "good moral character," integrity and the absence of "good cause" to deny a license violate the Second Amendment. See, *Schneider v. New Jersey*, 308 U.S. 147 (1939).

   d. The apparently unrestrained grant of authority to licensing officials to revoke licenses "at any time" violates the plaintiffs' right to bear arms.

   e. The costs of obtaining a permit are unduly burdensome for poor persons and persons of modest means.

   f. The amount of time permit applicants are required to wait for approval is unduly burdensome, particularly for people who are elderly, terminally ill and who have an urgent need for firearms for self-defense because they live in a high crime area or have been threatened.

g. In the case of the terminally ill or the elderly, the waiting period could exceed their actual lifespan or a large portion of their lifespan.

h. The statute's requirement that an applicant prove he has not been convicted of a "serious offense" is unconstitutionally overbroad.

i. The mandatory disclosure of close friends for references, together with the imposition on them of a criminal background check and the imposition upon the applicant of the burden of confessing to one's close friends all of one's sins and shortcomings that a licensing official might conceivably deem significant (see, *Novick v. Hillery,* 183 AD2d 1007 (3rd Dept. 1992)), violates the privacy of all concerned, is unduly burdensome and invites retaliation against political activists and their closest friends.

j. The mandate to provide references in the county where the application is processed violates the rights of those who recently moved into an area.

k. Applicants bear the burden of proof of their entitlement to the "right" to bear arms; receive no hearing before their entitlement to this right is initially determined, and receive post-deprivation judicial review that presumes the licensing officer's decision is correct and applies a deferential standard of review and imposes the burden of proving error upon the alleged "right"-holder.

l. Because the requirement of "good moral character" and absence of a "serious offense" are essential parts of the statutory scheme, the entire statute should be vacated.

m. Applicants bear the burden of proof of their entitlement to the "right" to bear arms; receive no hearing before their entitlement to this right is initially

15

determined, and receive post-deprivation judicial review that presumes the licensing officer's decision is correct and applies a deferential standard of review and imposes the burden of proving error upon the alleged "right"-holder.

## THIRD CAUSE OF ACTION
## DUE PROCESS—14th AMENDMENT

85. The requirements that an applicant prove:

    a. that he has "good moral character;"
    b. "proper cause" for the issuance of a carrier permit, and
    c. the absence of "good cause" to deny a license—

    violate due process.

86. That is, these terms are not capable of definition in such a way that puts an applicant, a licensing officer or a reviewing court on notice of the meaning of the terms.

87. Therefore, the state, its licensing officers and reviewing judges, are given unfettered discretion in denying an application based on their own whimsical notion of what these terms mean.

**WHEREFORE**, the plaintiffs respectfully request that the Court:

A. Enter a declaratory judgment that the provisions of the Penal Law specified herein infringe on the right of the people to keep and bear arms and right to due process, in violation of the Second and Fourteenth Amendments to the United States Constitution and are void.

B. Issue preliminary and permanent injunctions enjoining defendants ANDREW M.

CUOMO, ERIC T. SCHNEIDERMAN, and JOSEPH A. D'AMICO, and their officers, agents, and employees from administration and enforcement of the provisions alleged herein to violate the United States Constitution.

    C. Award attorneys' fees and costs; and

    D. Grant such other and further relief as may be proper.

Dated: Buffalo, New York
       July 21, 2015                           /s/ James Ostrowski
                                            James Ostrowski
                                            Attorney for the Plaintiffs
                                            63 Newport Ave.
                                            Buffalo, New York 14216
                                            (716) 435-8918
                                            jameso@apollo3.com