UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

LIBERTARIAN PARTY OF ERIE COUNTY,
MICHAEL KUZMA,
RICHARD COOPER,
GINNY ROBER,
PHILIP M. MAYOR,
MICHAEL REBMANN,
EDWARD L. GARRETT,                                        15-CV-654-G
DAVID MONGIELO,
JOHN MURTARI,
WILLIAM A. CUTHBERT,

                        *Plaintiffs,*                          **AMENDED
                                                              COMPLAINT**

            v.

ANDREW M. CUOMO, individually and as Governor of the State of
New York,
ERIC T. SCHNEIDERMAN, individually and as Attorney General
of the State of New York; and,
JOSEPH A. D'AMICO, individually and as Superintendent of the New York State
Police.
MATTHEW J. MURPHY, III, individually and as Niagara County pistol permit licensing
officer,
DENNIS M. KEHOE, individually and as Wayne County pistol permit licensing officer,
M. WILLIAM BOLLER, individually and as Erie County pistol permit licensing officer,

                        *Defendants.*

---

> "The right of the citizens to keep and bear arms has justly been considered, as the
> palladium of the liberties of a republic; since it offers a *strong moral check
> against the usurpation and arbitrary power of rulers*; and will generally, even if
> these are successful in the first instance, *enable the people to resist and triumph
> over them.*"
>
>                        --Joseph Story, COMMENTARIES ON THE
>                        CONSTITUTION OF THE UNITED STATES (1833)
>                        (emphasis added)

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Plaintiffs hereby demand a jury trial of all issues so triable.

## INTRODUCTION

1. This is an action to vindicate the right of the plaintiffs to keep and bear arms under the Second Amendment to the United States Constitution, which prohibits infringement of the right of law-abiding citizens to keep commonly-possessed firearms for the defense of self and family and for other lawful purposes.

2. This is an amended complaint as of right pursuant to the Federal Rules of Civil procedure.

## PARTIES

3. The Plaintiff, LIBERTARIAN PARTY OF ERIE COUNTY, is an unincorporated association operating in Erie County whose platform includes support for the right to bear arms.

4. The  LIBERTARIAN PARTY OF ERIE COUNTY brings this action on behalf of itself and its members.

5. The plaintiff MICHAEL KUZMA is a resident of the City of Buffalo and Erie County.

6. The plaintiff RICHARD COOPER is a resident of the Town of Westbury and County of Nassau.

7. The plaintiff GINNY ROBER is a resident of the Town of Vestal and Broome County.

8. The plaintiff PHILIP M. MAYOR is a resident of the Village of East Aurora and Erie County.

9.      The plaintiff MICHAEL REBMANN is a resident of the Town of Amherst and Erie County.

10.     The plaintiff EDWARD L. GARRETT is a resident of the Town of Evans and Erie County.

11.     The plaintiff DAVID MONGIELO is a resident of the Town of Lockport and Niagara County.

12.     The plaintiff JOHN MURTARI is a resident of the Town of Lyons and Wayne County.

13.     The plaintiff WILLIAM A. CUTHBERT is a resident of the City of Buffalo and the County of Erie.

14.     Defendant ANDREW M. CUOMO is the Governor of the State of New York whose principal place of business is in Albany (Albany County), New York.

15.     Defendant ERIC T. SCHNEIDERMAN is the Attorney General of the State of New York whose principal place of business is in Albany (Albany County), New York.

16.     Defendant JOSEPH A. D'AMICO is Superintendent of the New York State Police whose principal place of business is in Albany (Albany County), New York.

17.     MATTHEW J. MURPHY, III, is the Niagara County pistol permit licensing officer.

18.     He is also a judge but is not acting in a judicial capacity when issuing permits.

19.     The defendant M. WILLIAM BOLLER is an Acting New York State Supreme Court Justice and is the licensing officer for pistol permits in Erie County.

20.     At all times herein, Justice Boller was not acting in his capacity as a judge but rather in the capacity of a licensing officer.

21.     The defendant DENNIS M. KEHOE is the Wayne County pistol permit licensing officer.

22.     He is also a judge but is not acting in a judicial capacity when issuing permits.

23.     Licensing officers in New York State, in addition to determining applications for pistol permits, on information and belief, also engage in investigations of applicants and work closely with various police agencies in monitoring the behavior of permit holders, applicants and those whose permits have been suspended.

24.     Licensing officers also act as prosecutors of permit applicants and those whose permits have been suspended.

25.     Thus, licensing officers do not act in a judicial capacity but rather their duties include investigatory, prosecutorial and law enforcement functions fundamentally inconsistent with the judicial function.

26.     On information and belief, licensing officers routinely receive information and evidence about permit applicants or suspended holders of permits on an informal basis and on occasion without the knowledge of the applicant or holder of a permit.

27.     All Defendants herein are being sued individually and in their official capacities.

**JURISDICTION**

28.     Jurisdiction is founded on 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(a)(3) as

this action seeks to redress the deprivation, under of color of the laws, statutes, ordinances, regulations, customs and usages of the State of New York, of rights, privileges or immunities secured by the United States Constitution.

29.    The Court has supplemental jurisdiction over state law claims. 28 U.S.C. §§ 1367.

30.    This action seeks relief pursuant to 28 U.S.C. §§ 2201, 2202, 42 U.S.C. § 1983 and CPLR Article 78.

31.    Venue lies in this district pursuant to 28 U.S.C. § 1391.

**FACTUAL ALLEGATIONS RELATED TO ALL CAUSES OF ACTION**

32.    The plaintiffs would like to exercise their natural right to keep and bears arms, a right the existence of which is acknowledged by and protected by the Second Amendment to the United States Constitution, applicable to the States pursuant to the Fourteenth Amendment to the United States Constitution. *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. Chicago*, 561 U.S. 742 (2010).

33.    This right is threatened by New York State laws and their enforcement by the defendants as specified below.

34.    The plaintiffs would like to exercise such right for all the reasons underlying the Second Amendment, including but not limited to self-defense and the defense of their families against criminals and defense and deterrence against the prospect of tyrannical government.

35.    Examples of tyrannical governments in history include the Soviet Union, Nazi Germany and Pol Pot's Cambodia.

36.     The signposts of incipient tyrannical government in America would include one or more of the following:

    a.     Mass confiscation of firearms;

    b.     Mass arrests without probable cause;

    c.     A crackdown on free speech, press or assembly;

    d.     Martial law (other than during an actual invasion by a foreign army);

    e.     Prohibition of homeschooling or private schools;

    f.     House-to-house searches or permanent roadblocks, checkpoints or mandatory internal passports.

37.     While the United States government has not engaged in these practices or the kinds of atrocities associated with the States cited above, it is reasonable to be concerned about the future.

38.     A recent study found the federal government guilty of systematic torture of detainees in the years after 9/11.

39.     Historian R. J Rummel, an expert on democide (murder by government), estimates that in the 20th Century, American government killed over 500,000 people, mostly non-combatants killed during bombing raids in foreign wars.

40.     The relative rarity of democide against American citizens is consistent with the notion that a well-armed populace deters democide.

41.     In Federalist No. 46, James Madison argued that there is no reason to be concerned about the federal government becoming tyrannical in part because of "the advantage of being armed, which the Americans possess over the people of almost every other nation. . ."

42.     Madison, in effect, argued that the armed populace would defeat the Federal

Government's "standing army" in battle!

43.     If the drive to deprive Americans of their right to bear arms continues, Americans

could soon be as vulnerable to democide as any other people.

### The Purpose of the Right to Bear Arms

44.      The appearance of the signposts of tyrannical government would trigger the right

of the people to alter or abolish their government using the tools provided by the

right to bear arms, that right being the guarantor of the right of revolution

recognized in the Declaration of Independence.

45.     The right of revolution, stated by Jefferson and Lincoln and put into practice by

Washington, is itself simply the manifestation of the fact that the *people, not the

government*, have ultimate and unalienable sovereign power.

46.     Thus, the currently fashionable and shallow approach of treating the right to bear

arms as merely a nuisance standing in the way of the battle against street crime, is

rooted in willful historical ignorance.

47.     The Supreme Court has held that the right to bear arms is a "fundamental right."

*McDonald v. Chicago*, 561 U.S. 742, 778 (2010).

48.     The right to bear arms is entitled to at least the same amount of respect, protection

and enforcement that is provided to the other fundamental rights such as free

speech, petition, assembly and due process.

49.     If there is to be any disparate treatment of the right to bear arms due to its unique

nature, it should be given even greater respect, protection and enforcement than

the other rights because, logically, historically and empirically, *it is the most*

*important right enumerated in the Bill of Rights; it is the right that protects and guarantees all the others.*

50.     Unlike the rights to free speech, religion, assembly and petition, being deprived of the right to bear arms can result in immediate death at the hands of a criminal or a tyrannical government (see, e.g., Kent State, Wounded Knee), such death rendering the entire remainder of the Bill of Rights moot and meaningless at that point.

51.     Each year in the United States, there are numerous reports of police misconduct and many fatalities associated with those complaints.[1]

52.     At the same time when New York State is aggressively attacking the people's right to bear arms, law enforcement is rapidly escalating its own firepower.

53.     According to a study by the Cato Institute, "Over the last 25 years, America has seen a disturbing militarization of its civilian law enforcement, along with a dramatic and unsettling rise in the use of paramilitary police units (most commonly called Special Weapons and Tactics, or SWAT) for routine police work. The most common use of SWAT teams today is to serve narcotics warrants, usually with forced, unannounced entry into the home. These increasingly frequent raids, 40,000 per year by one estimate, are needlessly subjecting nonviolent drug offenders, bystanders, and wrongly targeted civilians to the terror of having their homes invaded while they're sleeping, usually by teams of heavily armed paramilitary units dressed not as police officers but as soldiers. These raids bring unnecessary violence and provocation to nonviolent drug offenders, many

---

[1] L. Dane, "500 Innocent Americans Killed by Cops Each Year," *LewRockwell.com* (Dec. 16, 2013).

of whom were guilty of only misdemeanors. The raids terrorize innocents when police mistakenly target the wrong residence. And they have resulted in dozens of needless deaths and injuries, not only of drug offenders, but also of police officers, children, bystanders, and innocent suspects." ("Overkill: The Rise of Paramilitary Police Raids in America," by <u>Radley Balko</u>, July 17, 2006.)

54.     Furthermore, historically, it was the right to bear arms, exercised by the Colonists at Lexington and Concord to defeat the British gun control expedition that ultimately allowed the Colonists to form their own government and enshrine the other rights into the Bill of Rights after the war was won.

**New York Gun Laws**

55.     Presently, in the State of New York, the plaintiffs cannot lawfully purchase, possess, carry, keep or bear a "firearm" in their home as that term is defined in the New York without the permission of local officials. N.Y. PEN. LAW §§ 265.00(3), 265.01-265.04, 265.20(a)(3), 400.00.

56.     These statutes are challenged on their face, as applied herein and based on their widely varying customary applications from county to county.

57.     Plaintiffs can only keep and bear a pistol or revolver or handgun in their home with the prior permission of the state—a license--after meeting, in the subjective opinion of a state licensing officer, a number of different criteria the imposition of which violates the Second Amendment.

58.     The United States Court of Appeals described the latitude provided state judges in denying licenses as being "vested with considerable discretion." *Kachalsky v. County of Westchester*, 701 F.3d 81, 87 (2d Cir. 2012).

59. Such unlicensed possession would constitute a crime under the Penal Law and subject the plaintiffs to the risk of prosecution and imprisonment merely for exercising their natural and constitutional right to bear arms in their own homes for noble purposes.  See, N.Y. PEN. LAW §§ 265.00(3), 265.01-265.04, 265.20(a)(3), 400.00.

60. Thus, New York State explicitly treats the right to bear arms as a "privilege," not a right, and *boasts of this unconstitutional policy* in numerous court decisions. E.g., *Guddemi v. Rozzi,* 210 AD2d 479 (2nd Dept. 1994); *Shapiro v. New York City Police Dept.,* 201 AD2d 333 (1st Dept. 1994).

61. For example, applicants must prove they have "good moral character."

62. The state may not condition the exercise of a fundamental right on prior proof of "good moral character."

63. The term "good moral character" is undefined in the statute and is not susceptible of any precise definition or any rational definition whatsoever.

64. In our society, there is no general agreement of what "good moral character" means.

65. Some behavior that years ago would have been considered proof of the lack of good moral character is no longer considered to be such.

66. The statute also conditions the issuing of a permit on the absence of "good cause . . . for the denial of the license," yet, provides no definition of "good cause," thus placing the recognition of constitutional rights in the hands of bureaucrats and their arbitrary and subjective judgments.  Penal Law 400(1)(g).

67.     The imposition of such conditions that are impossible to define violates both the Second Amendment right to bear arms and the due process clauses of the Fifth and Fourteenth Amendments.

68.     In most counties in the state, it can take a year or more to obtain a permit.

69.     If the permit is denied, judicial intervention can take an additional year and a half including one appeal as of right to the Appellate Division and cost as much as $5000 for legal fees and costs.

70.     The permit process involves a massive invasion of privacy, forcing the applicant to identify his or her closest friends who are then subjected to a criminal record check themselves.

71.     The permit process can be expensive, thus preventing many low-income persons from applying for a permit.

72.     The permit process can also be time-consuming, constituting a burden not imposed for the exercise of numerous other fundamental constitutional rights.

73.     In the case of an application for a carrier permit, the applicant must prove "proper cause" in order to exercise a fundamental right.

74.     While this requirement has been ruled constitutional by the United States Court of Appeal's for the Second Circuit, it is complained of here so as to preserve the issue for reconsideration by the Second Circuit or review by the Supreme Court. See, *Kachalsky v. County of Westchester*, 701 F.3d 81. (2d Cir. 2012); but see *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014).

75.     A right that can only be exercised by seeking prior permission of the government, which permission can be withheld at the government's subjective discretion, is a right that has ceased to exist.

76.     The plaintiffs seek injunctive and declaratory relief to remedy the defendants' violation of their right to bear firearms in their homes and elsewhere.

77.     The plaintiffs PHILIP M. MAYOR and WILLIAM A. CUTHBERT have obtained a pistol permits but remain under constant threat of having their licenses revoked based on application of the arbitrary and subjective criteria set forth in the statute.

78.     Further, they are unlawfully restricted in the firearms they can purchase and carry and are forced by the risk of immediate arrest to carry their permits on them at all times.

79.     Permit holders also face a cumbersome process for adding firearms onto their permits, often involving several trips to the licensing office and gun store and delays of several weeks before being allowed the carry newly purchased firearms.

80.     The plaintiff DAVID MONGIELO held a concealed carry permit prior to being falsely arrested at an illegal City of Lockport police roadblock on June 27, 2013.

81.     After the plaintiff was falsely arrested and assaulted by the police and maliciously prosecuted for obstruction of governmental administration and resisting arrest, the defendant, MATTHEW J. MURPHY, on July 3, 2013, without any prior notice and without any form of due process, and in violation of the plaintiff's right to bear arms, temporarily suspended his permit based on whatever unspecified information he had received from those who falsely arrested the plaintiff.

82.    The plaintiff was on the same date ordered to surrender his permit and all pistols
to the sheriff.

83.    The plaintiff was subsequently acquitted of all charges except a technical cell
phone violation (he tried to film the illegal arrest with his cell phone).

84.    The plaintiff then filed suit against the City of Lockport and the arresting officers.
See DAVID J. MONGIELO v. The CITY OF LOCKPORT, ET AL., WDNY, 15-
CV-486 FPG.

85.    That case was recently settled.

86.    Although the plaintiff requested a hearing on or about July 13, 2013, none was
scheduled until after plaintiff and plaintiff's attorney contacted the pistol permit
office.

87.    The plaintiff was told by the staff that Judge Murphy preferred not to schedule
such a hearing until a separate legal proceeding bearing no rational relationship to
pistol permits was completed.

88.    The fact that Judge Murphy even learned about the unconnected legal matter is
itself disturbing and raises serious due process concerns.

89.    No American may be deprived of his constitutional rights because of a pending
and irrelevant legal proceeding.

90.    Nevertheless, Judge Murphy did schedule a hearing on the matter for February 18,
2016, over thirty months after the false arrest.

91.    As an outspoken citizen frequently at odds with the Niagara County political
machine and political class, the plaintiff is at risk of such outrageous and
unwarranted permit suspensions in the future as well.

92.     The plaintiff WILLIAM A. CUTHBERT applied for a pistol permit in Erie

County on July 19, 2013.

93.     Although his application was uncomplicated and presented no grounds for denial

of a permit, the issuance of his permit was delayed until May 18, 2015.

94.     Furthermore, the defendant M. WILLIAM BOLLER limited his permit to hunting

and target shooting in violation of his Second Amendment right to bear arms.

95.     Both the excessive delay and the restriction in use to two functions that are

essentially unrelated to the purposes of the Second Amendment—hunting and

target shooting—violate the plaintiff's Second Amendment rights.

96.     The plaintiff JOHN MURTARI, applied for a pistol permit in Wayne County.

97.     On November 24, 2015, his application was denied by the defendant DENNIS M.

KEHOE.

98.     The denial letter reads as follows and is quoted in full;

"Dear Mr. Murtari:

"I have received and reviewed your pistol application, as well as the
Wayne County Sheriff report in therewith.  Additionally, I have reviewed
items submitted Lyons Police Department as well as numerous internet
comments from the internet site (akidsright.org) referenced by you in your
application.

"My review of your application and various other documents contained
in your pistol permit file indicates that you have been arrested on
numerous occasions (approximately 50 times) since on or about 1998
through 2010. It is my understanding that the vast majority of your arrests
were based on what might be considered minor incidents that, by and
large, were dropped at a later point in time. I also note that these arrests
include several matters that were initially adjourned in contemplation of
dismissal and then subsequently dismissed.

"It appears that the website to which you referred me indicates that you
have zealously engaged in what appears to be a course of civil
disobedience of a Federal Court Order, and in conduct constituting

trespass on four different occasions, involving imposition of a ten (10) day, a thirty-five (35) day, a forty-four (44) days, and a fifty-three (53) day sentences in jail.

"At your suggestion, I did speak with the U.S. Attorney for the Northern District of New York, Richard Southwick, Esq. I also note from the above-referenced website to which you referred to in your application that you have been incarcerated by New York State Family Court for failure to pay child support.  It appears that on at least one occasion you were incarcerated for six (6) months for non-payment of child support, and that you stopped eating food to the extent you had to be fed by a gastric feeding tube after three (3) months of incarceration, as a result of your refusal to feed yourself.

"It further appears that your refusal or failure to pay child support as ordered resulted in your having accumulated child support arrears in excess of one-hundred thousand dollars ($100,000.00), prior to a compromise with your ex-wife that resulted in a one-time payment by you of ten thousand dollars ($10,000,00).

"Your prior conduct in failing to obey lawful orders issued in the Federal Court System, as well as in the State Family Court System, constitutes 'good cause' for this Court to deny your application for a pistol permit at this time.

"I also advise that any of your matters that were concluded by way of an ACD cannot be considered as having been resolved on the merits.

"I hereby deny your application for a pistol permit at this time based on 'good cause' shown as set forth above.

"Please note that, while there is no appeal from an order of this nature, you may explore the possibility of challenging the Court's decision by way of an Article 78 proceeding in the appropriate Appellate Division.

"In the event you remain compliant in the future with all lawful court orders, as well as Federal and State statutory law, for an extended period of time, you may wish to make a new application demonstrating that you have not incurred violations of law.

"Very truly yours, Dennis M. Kehoe, County Court Judge"

99.     What the denial letter omits is that the plaintiff graduated from the Naval
        Academy in 1978, is a former Air Force pilot and was honorably
        discharged as a captain in 1984.

100.    The plaintiff is a devotee of the philosophy of non-violence espoused by
        Gandhi and Martin Luther King and formed a group of mothers and
        fathers to promote family rights and used peaceful non-violent tactics to
        promote the need for change.

101.    While reasonable minds may differ about the wisdom of non-violent civil
        disobedience, such behavior and the inability to pay debts is simply not
        grounds for the denial of second amendment rights as explained in *Heller*
        and *McDonald* (grounds for denial include being a felon and being
        mentally ill).

102.    None of the charges against the plaintiff resulted in a felony conviction.

103.    With respect to the plaintiff JOHN MURTARI, no prior application has been
        made for the relief now requested and all administrative remedies have been
        exhausted.

104.    While the primary purpose of the right to bear arms is to deter government
        tyranny and allow the people to resume their sovereignty against a tyrannical
        government, personal and familial self-defense is an important secondary
        purpose.

105.    Several of the plaintiffs travel in or reside in or nearby high crime areas where
        murder, rape, robbery, and house burglaries are common.

106.    Police response time in areas where the plaintiffs reside is no better than five
minutes for high priority calls.

107.    A burglar can break into a home within seconds.

108.    Thus, even if plaintiffs were able to locate a phone in the dark after being roused
from sleep by a thug breaking a window, it is extremely unlikely that they could
summon police assistance before a confrontation with a dangerous criminal in
their own homes.

109.    The plaintiffs must have access to firearms in their homes to protect themselves
and their families from violent crime.

110.    Guns are a useful self-defense tool and are used tens of thousands of times each
year in the United States to ward off criminals.

111.    Mere gun possession does not cause crime.  The proof of that proposition can
been seen in the suburban and rural areas surrounding high-crime Buffalo.

112.    While the rates of gun ownership in these towns are very high, rates of violent
crime are much lower than in urban areas with lower rates of gun ownership.

113.    High crime rates in urban areas are caused, not by the availability of guns, but by
numerous failed public policies such as the war on drugs, welfare (leading to
fatherless families), and government schools leaving students ill-prepared for
working in the lawful economy, and economic policies which make urban areas
hostile places for entry-level jobs.

114.    Thus, gun control laws serve the important political function of offering up a
scapegoat for the failure of various government policies that engender crime.

115.   The courts should not allow politicians to destroy fundamental rights by using them as scapegoats for their own failures.

116.   As Governor of the State of New York, defendant ANDREW M. CUOMO "shall take care that the laws are faithfully executed." N.Y. Const., Art. IV, §3. As such, the Governor is responsible for the administration and enforcement of the Penal Law, which he conducts through various officers, agents, and employees.

117.   The Governor exercises direct supervisory control over the State Police and can hire or fire its Superintendent at his discretion.

118.   The Governor is committed to violating the plaintiffs' right to bear arms whenever he or his subordinates can do so and by whatever means are available.

119.   As Attorney General for the State of New York, defendant ERIC T. SCHNEIDERMAN shall "prosecute and defend all actions and proceedings in which the state is interested . . . ." Executive Law § 63(1).

120.   The Attorney General also has significant criminal jurisdiction and has directly involved his office in firearms law enforcement, for example, by launching an investigation of sales of guns at gun shows without background checks.

121.   On information and belief, the Attorney General can investigate and prosecute various crimes if asked to do so by the state Police.

122.   The Attorney General is committed to violating the plaintiffs' right to bear arms whenever he or his subordinates can do so and by whatever means are available.

123.   As Superintendent of the New York State Police, defendant JOSEPH A. D'AMICO is required to enforce the criminal and administrative provisions of the Penal Law throughout the State. "It shall be the duty of the superintendent of the

state police and of members of the state police to prevent and detect crime and apprehend criminals." Executive Law § 223.

124.   The State Police is a quasi-military organization in which all officers must follow the orders of the Superintendent on pain of being immediately terminated.

125.   The Superintendent, with the approval of the Governor, his superior officer, is committed to violating the plaintiffs' right to bear arms whenever he or his subordinates can do so and by whatever means are available.

126.   A casual review of recent media reports and reports from the State Police's own website, indicates that, with the approval and under the direction of the Superintendent, the State Police are engaged in the regular investigation, arrest and prosecution of anyone they believe to be in violation of the State's unconstitutional pistol permit law and related criminal statutes.  See, N.Y. PEN. LAW §§ 265.00(3), 265.01-265.04, 265.20(a)(3), 400.00.

127.   Recent examples include;

- The arrest of two persons on September 2, 2015 in Niagara Falls for criminal possession of a handgun without a license.

- The arrest of two persons on October 23, 2013, in Monticello for criminal possession of a handgun without a license.

- The arrest of a man on September 10, 2015 in Sturbridge for criminal possession of a handgun without a license.

- The arrest of a man on October 21, 2015 in South Plymouth for criminal possession of an unlicensed handgun.

128.   On information and belief, the State Police regularly refer matters to the relevant pistol permit licensing officer when they believe that any permit holder has violated a criminal statute.

129.   If any one of the unlicensed plaintiffs were found by the State Police to be in possession of a handgun, they would be immediately arrested by the State Police and thus the State Police are a direct, palpable and immediate threat to violate their right to bear arms whenever the plaintiffs choose to exercise that right.

130.   Because of the administration and enforcement of the above provisions of the pistol permit law and related criminal statutes by the defendants, the plaintiffs have been, and will continue to be, subjected to irreparable harm.

131.   At all times herein, the defendants were acting under color of state law.

132.   All of the statutes, regulations, court actions, customs and practices referenced herein constitute state action within the meaning of the Constitution.

133.   At all times herein, the actions of the defendants have been intentional or in reckless disregard of the clearly established rights of the plaintiffs.

**VI. DAMAGES**

134.   On account of the Defendants' actions and violations of their rights as set forth above, the Plaintiffs suffered actual damages, including loss of liberty, pain, suffering, humiliation and emotional distress, and were forced to expend funds for permit fees and related expenses.

135.   Plaintiffs are entitled to recover compensatory and punitive damages, attorney's fees and costs.

136.    Plaintiffs demand prejudgment interest on all elements of out-of-pocket loss including attorneys' fees.

## FIRST CAUSE OF ACTION

## SECOND AMENDMENT

137.  The New York pistol permit law (Penal Law Sections §§ 400.00 and 265.00) on their face and as it is applied by state and local officials, violates the Second Amendment and Fourteenth Amendment rights of the plaintiffs to possess firearms in their homes for the following reasons:

a.  A state may not license or impose a prior restraint on a fundamental right.  See, e.g., the 1st, 3rd, 4th, 5th, 6th, 7th, 8th and 14th Amendments; *Murdock v. Pennsylvania*, 319 U.S. 105 (1943).

b.  The requirements of proving "good moral character," integrity and the absence of "good cause" to deny a license violate the Second Amendment.  See, *Schneider v. New Jersey*, 308 U.S. 147 (1939).

c.  The apparently unrestrained grant of authority to licensing officials to revoke licenses "at any time" violates the plaintiffs' right to bear arms.

d.  The costs of obtaining a permit are unduly burdensome for poor persons and persons of modest means.

e.  The amount of time permit applicants are required to wait for approval is unduly burdensome, particularly for people who are elderly, terminally ill and who have an urgent need for firearms for self-defense because they live in a high crime area or have been threatened.

f.  In the case of the terminally ill or the elderly, the waiting period could exceed their actual lifespan or a large portion of their lifespan.

g.  The statute's requirement that an applicant prove he has not been convicted of a "serious offense" is unconstitutionally overbroad.

h.  The mandatory disclosure of close friends for references, together with the imposition on them of a criminal background check and the imposition upon the applicant of the burden of confessing to one's close friends all of one's sins and shortcomings that a licensing official might conceivably deem significant (see, *Novick v. Hillery,* 183 AD2d 1007 (3rd Dept. 1992)), violates the privacy of all concerned, is unduly burdensome and invites retaliation against political activists and their closest friends.

i.  The mandate to provide references in the county where the application is processed violates the rights of those who recently moved into an area.

j.  Applicants bear the burden of proof of their entitlement to the "right" to bear arms; receive no hearing before their entitlement to this right is initially determined, and receive post-deprivation judicial review that presumes the licensing officer's decision is correct and applies a deferential standard of review and imposes the burden of proving error upon the alleged "right"-holder.

**SECOND CAUSE OF ACTION**

**SECOND AMENDMENT**

138.    The New York pistol permit law (Penal Law Section 400.00 and 265.00), on its face, violates the Second Amendment and Fourteenth Amendment rights of the plaintiffs to carry firearms in public for the following reasons:

a.  The requirement of an applicant for a carrier permit to show "proper cause," a determination ultimately based on the virtually unfettered discretion of licensing officials and review judges, violates the Second Amendment.

22

b.  A state may not license or impose a prior restraint on a fundamental right.  See,
    e.g., the 1st, 3rd, 4th, 5th, 6th, 7th, 8th and 14th Amendments; *Murdock v.
    Pennsylvania*, 319 U.S. 105 (1943).

c.  The requirements of proving "good moral character," integrity and the absence of
    "good cause" to deny a license violate the Second Amendment.  See, *Schneider v.
    New Jersey*, 308 U.S. 147 (1939).

d.  The apparently unrestrained grant of authority to licensing officials to revoke
    licenses "at any time" violates the plaintiffs' right to bear arms.

e.  The costs of obtaining a permit are unduly burdensome for poor persons and
    persons of modest means.

f.  The amount of time permit applicants are required to wait for approval is unduly
    burdensome, particularly for people who are elderly, terminally ill and who have
    an urgent need for firearms for self-defense because they live in a high crime area
    or have been threatened.

g.  In the case of the terminally ill or the elderly, the waiting period could exceed
    their actual lifespan or a large portion of their lifespan.

h.  The statute's requirement that an applicant prove he has not been convicted of a
    "serious offense" is unconstitutionally overbroad.

i.  The mandatory disclosure of close friends for references, together with the
    imposition on them of a criminal background check and the imposition upon the
    applicant of the burden of confessing to one's close friends all of one's sins and
    shortcomings that a licensing official might conceivably deem significant (see,
    *Novick v. Hillery,* 183 AD2d 1007 (3rd Dept. 1992)), violates the privacy of all

23

concerned, is unduly burdensome and invites retaliation against political activists and their closest friends.

j.   The mandate to provide references in the county where the application is processed violates the rights of those who recently moved into an area.

k.   Applicants bear the burden of proof of their entitlement to the "right" to bear arms; receive no hearing before their entitlement to this right is initially determined, and receive post-deprivation judicial review that presumes the licensing officer's decision is correct and applies a deferential standard of review and imposes the burden of proving error upon the alleged "right"-holder.

l.   Because the requirement of "good moral character" and absence of a "serious offense" are essential parts of the statutory scheme, the entire statute should be vacated.

m.   Applicants bear the burden of proof of their entitlement to the "right" to bear arms; receive no hearing before their entitlement to this right is initially determined, and receive post-deprivation judicial review that presumes the licensing officer's decision is correct and applies a deferential standard of review and imposes the burden of proving error upon the alleged "right"-holder.

## THIRD CAUSE OF ACTION

## DUE PROCESS—14th AMENDMENT

139.   The requirements that an applicant prove:

a.   that he has "good moral character;"

b.   "proper cause" for the issuance of a carrier permit, and

c.   the absence of "good cause" to deny a license—

violate due process.

140.   That is, these terms are not capable of definition in such a way that puts an

applicant, a licensing officer or a reviewing court on notice of the meaning of the

terms.

141.   Therefore, the state, its licensing officers and reviewing judges, are given

unfettered discretion in denying an application based on their own whimsical

notion of what these terms mean.

### FOURTH CAUSE OF ACTION—Article 78 CPLR—

### WITH RESPECT TO THE PLAINTIFF JOHN MURTARI

142.   The defendant DENNIS M. KEHOE failed to perform a duty enjoined upon him

by law, specifically the statutes and constitutional provisions detailed in the

petition.

143.   Defendant's determination was arbitrary and capricious and an abuse of

discretion, including abuse of discretion as to the measure or mode of penalty or

discipline imposed.

144.   Defendant's determination was not supported by substantial evidence.

**WHEREFORE**, the plaintiffs respectfully request that the Court:

1.   Assume jurisdiction of this action;

2.   Enter judgment against the Defendants and in favor of the Plaintiffs;

3.   Enter a declaratory judgment that the provisions of the Penal Law specified herein

infringe on the right of the people to keep and bear arms and right to due process, in

violation of the Second and Fourteenth Amendments to the United States Constitution

and are void.

4.  Issue preliminary and permanent injunctions enjoining the defendants and their officers, agents, and employees from administration and enforcement of the provisions alleged herein to violate the United States Constitution.

5.  Award each Plaintiff compensatory damages, including prejudgment interest on any out of pocket damages;

6.  Impose punitive damages against each defendant;

7.  Award Plaintiffs all costs and disbursements incurred in the prosecution of this action, including reasonable attorneys' fees under 42 U.S.C. §1988; and

8.  Grant to the plaintiff JOHN MURTARI relief under CPLR Article 78 including vacating the order of the licensing officer and directing the licensing officer to issue a pistol permit to the plaintiff, and,

9.  Grant such other and further relief as may be proper.

Dated:  Buffalo, New York
December 23, 2015                        /s/ James Ostrowski
                                        James Ostrowski
                                        Attorney for the Plaintiffs
                                        63 Newport Ave.
                                        Buffalo, New York  14216
                                        (716) 435-8918
                                        jameso@apollo3.com

**Proof of Service**

James Ostrowski; an attorney at law admitted to practice in this Court, affirms under

penalties of perjury that on December 23, 2015, he served a copy of the attached document on

the party below by electronic filing with the clerk of the court:

> WILLIAM J. TAYLOR, ESQ.
> Assistant Attorney General
> 120 Broadway, 24th Floor
> New York, N. Y. 10271
> William.taylor@ag.ny.gov

Dated: Buffalo, New York
      December 23, 2015
                                     /s/ James Ostrowski
                                     JAMES OSTROWSKI
                                     Attorney for Plaintiff
                                     63 Newport Ave.
                                     Buffalo, New York 14216
                                     (716) 435-8918
                                     jameso@apollo3.com